**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

CIVIL ACTION NO. _____

*ELECTRONICALLY FILED*

| | |
|---|---|
| **CHURCH MUTUAL INSURANCE COMPANY** | **PETITIONER** |
| v. | |
| **"FIRST CHURCH OF GOD", INC., WINCHESTER, KENTUCKY**<br>Serve: Allan Hutchinson<br>  2500 Colby Road<br>  Winchester, KY 40391 | **RESPONDENTS** |
| And | |
| **CLARK COUNTY CHRISTIAN SCHOOL, INC.**<br>Serve: Pat Smith<br>  2500 Colby Road<br>  Winchester, KY 40391 | |

**PETITION FOR DECLARATORY RELIEF TO A) APPOINT UMPIRE AND B) INSTRUCT APPRAISAL PANEL**

---

Petitioner, Church Mutual Insurance Company ("Church"), through counsel, hereby petitions this Court pursuant to 28 U.S.C. § 2201, for a declaration of rights; namely, to appoint an umpire for the purposes of fulfilling certain rights and responsibilities between Petitioner and Respondents, "First Church of God," Inc., Winchester, Kentucky ("FCG") and Clark County Christian School, Inc. ("CCCS"), with respect to a dispute resolution process provided in an insurance policy issued by Church to FCG and CCCS. In support of this Petition, Church states as follows:

1. Church is a corporation organized under the laws of Wisconsin, with a principal place of business located at 3000 Schuster Lane, Merrill, Wisconsin. Church is authorized by the Kentucky Department of Insurance to issue lines of property and casualty insurance coverage in Kentucky.

2. Church offers commercial insurance products, including property and casualty policies to churches, camps, and faith-based non-profit organizations and schools.

3. FCG is a non-profit corporation organized under the laws of Kentucky, with a principal location at 2500 Colby Road, Winchester, KY, 40391.

4. CCCS is a non-profit corporation organized under the laws of Kentucky, with a principal location at 2450 Colby Road, Winchester, KY, 40391.

5. This Court has subject matter jurisdiction over this matter pursuant to the aforementioned statutory reference, and as set forth in 28 U.S.C. 1332 and Fed. R. Civ. P. 57, as the ultimate amount in controversy exceeds $75,000.00[1] and the parties have complete diversity of citizenship. An actual case or controversy exists between Church and the Respondents, as the parties have the right to seek appointment via this Court of an umpire; the inability to agree upon an umpire prevents either party from proceeding forward under the dispute resolution mechanism in the Policy, as the appraisal cannot occur without an umpire.

6. At all relevant times, Church had in full force and effect with the Respondents a policy of casualty insurance covering certain real property located at 2500 Colby Road, Winchester, Kentucky (the "Real Property"). A true and accurate copy of the relevant portions of the insurance policy is attached to this petition as Exhibit 1[2] (Policy No. 0055560 25-443210, the

---

[1] It is believed that, as will be explained *infra*, the amount in controversy concerning the insurance claim could exceed $700,000.00.
[2] Exhibit 1 consists of the declarations page and the main insuring agreement; there are other forms and endorsements which constitute the Policy, but they are immaterial to this cause.

2

"Policy"). Church issued the Policy to Respondents on September 26, 2022, as a renewal of other prior policies issued to the Respondents.

7. On or about March 3, 2024, Church received notice of a loss being claimed by Respondents under the Policy. The loss notification claimed damage to the Real Property as the result of a hail and windstorm event on or about March 3, 2023, nearly one year before any notice was actually given to Church (the "Storm Loss"). The Respondents provided Church with a computer-generated estimate from "Stellar Restoration Services," who upon information and belief, holds contractor and roofing licenses in other states, but not in Kentucky. Stellar markets itself as an expert and advocate to its clients when navigating issues relating to loss events and insurance coverage. The computer-generated estimate from Stellar Restoration Services provided a cost estimate of **$780,992.41**, to *inter alia*, replace every single metal roofing panel on the Real Property. Stellar did not explain in its written estimate why it believed that replacement of every single metal roofing panel was necessary to repair any damage from wind events.

8. Despite Respondents' failure to follow the Policy's requirement that notice of a loss be given as soon as practicable, Church in good faith investigated the Storm Loss, including a physical inspection of the Real Property. As part of its investigation, Church retained the services of a qualified engineer (ProNet Group, Inc.) to analyze the roofing panels on the Real Property. The engineering report issued on April 17, 2024, determined that the Real Property did not have any indication of hail-related damage, and therefore concluded that the Storm Loss did not consist of any hail damage to the Real Property.

9. The engineering report did conclude that a handful of panels on the southern exposure of the roof had been unsealed by wind events over the history of the structure, including the wind event on March 3, 2023. The engineering report noted that the susceptibility of the panels

to unsealing was exacerbated by the fact that the seams themselves were improperly crimped by the party installing them, but that such could be addressed by simply re-crimping the metal seams in a proper fashion. Per the engineering report, nothing about the metal panels themselves had been damaged or degraded by any wind event. The engineering report also noted that some water infiltration had likely taken place through these unsealed seams, but that any water-stained interior ceiling tiles could be replaced, and the roof would be returned to a water-tight state with the aforementioned re-crimping of the panels' seams.

10. The engineering report also noted that in some areas of the roof, prior historical repairs with a sealant had failed due to age and wear, and that some water infiltration through the roofing panels had taken place due to these failures.

11. Despite the substantial prejudice that resulted to Church from Respondents' late notice of the Storm Loss – including but not limited to the loss of a timely ability to inspect the Real Property close in time to the claimed date of loss – Church proceeded to calculate the amounts payable under the Policy based upon the findings of the engineer. Church informed the Respondents that it believed the sum of $4,636.14 replacement cost value, less the $2,500 deductible, was the amount owed under the Policy for repair of the exterior metal roofing panels. Church also informed the Respondents that the sum of $1,451.22 replacement cost value, was the amount owed under the Policy for the replacement of interior water-stained ceiling tiles.

12. The loss amount payable was calculated by Church based upon the estimated cost of re-crimping the existing metal roofing panels, not replacing all of them as contemplated by Stellar Restoration Services.

13. On May 23, 2024, Church received correspondence from Ray Demeritt, who stated his affiliation with a company called "National Public Adjusting, LLC." Mr. Demeritt stated that

on behalf of the Respondents, he was "invoking appraisal" pursuant to the terms of the Policy. Mr. Demeritt asked Church to have its selected appraiser contact him upon selection, to begin the appraisal process. Mr. Demeritt did not provide Church with any signed appraiser agreement, compensation/fee agreement, or other written proof that in fact, the Respondents had formally hired him to act as an appraiser.

14. Despite not having sufficient proof as to a) the Respondents' having hired Mr. Demeritt to act as their appraiser; or b) whether Mr. Demeritt met the Policy's requirement of being "neutral" based upon *inter alia* his compensation agreement with Respondents, Church nonetheless responded to Mr. Demeritt's demand and appointed Kenneth Jones & Associates ("KJA") as its appraiser; specifically, Trent Verges, an employee of KJA.

15. Per the Policy, Mr. Demeritt and Mr. Verges attempted to jointly select a person to serve as Umpire for the appraisal panel.

16. Mr. Verges identified at least five different candidates to serve as umpire, including one person who a) is licensed as an independent adjuster in Kentucky, has served as umpire in over 3,000 appraisals in nineteen different states; b) has been appointed as an umpire by federal and state courts spanning Tennessee, Florida, South Carolina, Illinois, and Georgia; and c) whose largest loss assignment exceeded $70 million. Another candidate identified by Mr. Verges had served as umpire in over 7,000 appraisals in his career, and holds a windstorm umpire certification and a windstorm umpire advanced certification through the Windstorm Insurance Network.

17. None of the five candidates identified by Mr. Verges were acceptable to Mr. Demeritt. Mr. Demeritt stated that he had properly vetted all of them, but he had not actually spoken with at least two of these candidates at the time that he made this representation to Mr. Verges. Regardless, Mr. Demeritt did not agree to any of the candidates identified by Mr. Verges,

5

and instead suggested his own list of candidates.

18.     Mr. Demeritt identified five different candidates who he thought were appropriate to consider as an umpire. Mr. Verges vetted the candidates including verbal discussions with all five candidates, and determined that a) two of them were active public adjusters and only did work for policyholders; b) one said that he would be inclined to dismiss any opinion of engineers concerning any subject matter of the appraisal, as he was "smarter than any engineer", and would not consider any measure of repair for a roof other than one that resulted in an absolutely perfect match of all parts; c) one indicated that his primary method of resolving differences between appraisers was to simply ask the insured what they wanted to receive in their insurance claim, and would not consider any engineering report unless both appraisers agreed with the conclusions in the report; and d) one had previously done work for Church Mutual Insurance Company, which Mr. Demeritt had previously stated was a reason for disqualification of a candidate suggested by Mr. Verges. None of these individuals were acceptable to Mr. Verges.

19.     Mr. Demeritt as appraiser for the Respondents, and Mr. Verges as appraiser for Church have, as of the date of filing of this Petition, been unable to agree on an umpire to complete the appraisal panel.

## COUNT I – DECLARATION OF RIGHTS AS TO APPOINTMENT OF UMPIRE AND INSTRUCTION OF APPRAISAL PANEL

20.     Church incorporates by reference all factual allegations previously recited, as set forth in full.

21.     The Policy reads, in relevant part (the "Appraisal Clause"):

**2.    APPRAISAL**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having

6

jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and
b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

22. This Court has jurisdiction to appoint an umpire.

23. The umpire, in accordance with the holdings of *Motorists Mut. Ins. Co. v. Post*, 2005 WL 2674987 (E.D. Ky. 2005), is limited only to determining, if disputed between the parties, damages directly from a covered cause of loss. Further, per *Motorists Mut.*, the court may instruct an appraisal panel as to the scope of specific issues to be considered, in order to ensure the proper role of the appraisal process.

24. The appraisers selected by Church and Respondents have been unable to agree upon the identity of an umpire for purposes of completing the panel as to the amount of loss.

25. Per the Appraisal Clause, the parties are to petition a court for the appointment of an umpire, if the selected appraisers cannot agree upon the selection of an umpire. The costs of the umpire are to be shared evenly by Church and Respondents per the Appraisal Clause.

26. Accordingly, Church requests that this Court grant the requested relief, by entering an appropriate order appointing an individual to act as umpire, via the following process:

    a. After a responsive pleading is filed by Respondents, both Church and the Respondents shall simultaneously submit the identifies and CVs or other qualifying materials of candidates that they believe are qualified to serve as an umpire;

    b. That Church and the Respondents shall, 14 days after the submission of each's candidates, file in writing with the Court any i) agreement as to any candidate; or ii) objections with specific reasons why they are opposed to any candidate suggested; and

    c. Following such process, the Court may enter an order designating any individual identified by the parties, or one not identified by the parties, as

       the umpire, with the umpire's costs to be split evenly between Church and Respondents.

27. Further, Church seeks a declaration of rights that, regardless of the identity of the umpire, that the appraisal shall follow these guidelines:

    a. That it not be determinative of any issues other than the amount of loss to the Real Property directly resulting from wind damage according to the Policy's terms and conditions regarding same, and the appraisal panel is specifically barred from making any binding determination on either i) the date on which the loss occurred or ii) whether Respondents complied with the Policy's conditions precedent, including but not limited to whether or not the notice given to Church of the loss was in accordance with the Policy's conditions precedent;

    b. That the umpire consider all evidence made available to him/her, regardless of whether the use of such evidence is agreed to by both appraisers;

    c. That the umpire provided a written explanation for his/her determination to the extent that such resolves any disputed facts or issues between the two appraisers; and

    d. That in determining the amount of loss, that the appraisers and umpire should consider only damage resulting directly from the covered cause of loss, and must determine the cost to repair or replace the damage to the Real Property with material of comparable kind and quality to obtain an overall reasonably uniform appearance.

28. Church seeks no award of monetary damages, costs, or any other relief from this Court, other than a declaration that Respondents share evenly with Country the costs of the umpire's activity.

29. Church seeks the appointment of an umpire and instruction of the appraisal panel without prejudice to any other defenses it may have under applicable law, including but not limited to those outlined in Paragraph 15.

**WHEREFORE**, Church prays for the following relief:

    a. That this Court enter an Order declaring the following relief: appointing an umpire to conduct an appraisal as to the amount of loss, with the costs thereof to be borne evenly between Church and Respondents;

b.  That the appraisers and umpires be instructed as to the matters identified in Paragraph 26 *supra*, with respect to their conduct and determinations; and

c.  Such further relief as is just and appropriate under the circumstances.

Dated this the 4th day of September, 2024.

>
> Respectfully submitted:
>
> **FOWLER BELL PLLC**
>
> */s/ Matthew D. Ellison*
> **MATTHEW D. ELLISON**
> 300 W. Vine Street, Suite 600
> Lexington, KY 40507-1751
> (859) 252-6700
> (859) 255-3735 fax
> mellison@fowlerlaw.com
> **COUNSEL FOR PETITIONER,**
> **CHURCH MUTUAL INSURANCE COMPANY**

4872-9879-5738, v. 1/1771.00071